IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 25, 2005 Session

**STATE OF TENNESSEE v. JASON CURTIS JOHNSON**

**Direct Appeal from the Criminal Court for Wilson County**
**No. 02-0928    J. O. Bond, Judge**

---

**No. M2003-03060-CCA-R3-CD - Filed February 17, 2006**

---

Following a jury trial, Defendant, Jason Curtis Johnson, was convicted of one count of first degree premeditated murder and one count of second degree murder for the killing of Christy Waller and her unborn child, respectively. Defendant was sentenced to life imprisonment for his first degree murder conviction and twenty-five years for his second degree murder conviction, with the sentence for second degree murder conviction to be served consecutively to his life sentence. On appeal, Defendant argues (1) that the trial court erred in denying his motion to suppress; (2) that the trial court erred in admitting into evidence autopsy photographs of the victim's fetus; (3) that the evidence was insufficient to support Defendant's convictions; and (4) that the trial court erred in its sentencing determinations. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ., joined.

David M. Hopkins, Nashville, Tennessee (on appeal); and Comer L. Donnell, District Public Defender; and Adam Parrish, Assistant Public Defender, Lebanon, Tennessee (at trial), for the appellant, Jason Curtis Johnson.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Howard Lee Chambers, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Background**

For clarity in this opinion, Christy Waller will be referred to as the "victim," and her fetus as "the unborn child" or "fetus." James Damon Brock, Brian Hanna, and Jason Waller, the victim's

husband, worked for Townsend Tree Service. Mr. Brock testified that he picked up Mr. Waller and Mr. Hanna, who lived at the Waller residence, between 4:30 a.m. and 5:00 a.m. on September 17, 2002. The three men were scheduled to meet the company's trucks in Williamson County at 6:00 a.m. Mr. Brock observed the victim and Mr. Waller kiss and hug before Mr. Waller got into the car. Mr. Brock parked and locked his car, a white Honda Accord, at the company's designated meeting place. Mr. Brock said that only his girlfriend, Rebekah Crutcher, had a duplicate key to the car, and the car was in the same spot when Mr. Brock returned to the parking lot at the end of the workday.

Mr. Brock said that he and Mr. Hanna worked with the cutting crew, and Mr. Waller worked behind them with the chipper crew. As the day wore on, the chipper truck fell further and further behind the cutting truck. Mr. Brock said that he ate lunch with Mr. Waller from 12:15 p.m. to 12:30 p.m. Mr. Brock said that Mr. Waller drove his truck to the dump later that afternoon. Mr. Waller's truck had transmission problems, and a mechanic was dispatched to the dump site to fix the vehicle. Accordingly, Mr. Waller did not arrive back at the meeting place until 6:00 p.m. or 6:30 p.m.

Mr. Brock said that he drove back to Wilson County with Mr. Hanna and Mr. Waller, and the men stopped to visit a friend who lived about ten miles from the Waller residence. After visiting for approximately forty-five minutes, the three men bought something to drink at a market and then started toward Mr. Waller's home. Mr. Brock spotted Ms. Crutcher driving toward him. Ms. Crutcher turned her car around and caught up with Mr. Brock. Mr. Brock said that Ms. Crutcher was angry because the men were late getting home from work. Ms. Crutcher followed the men to the Waller residence.

The group did not see the victim when they arrived. Mr. Waller stayed in the front yard, and started calling people on a cell phone to see if he could find the victim. Mr. Brock said that Mr. Hanna entered the house first and returned with "space ship eyeballs." Mr. Hanna told Mr. Brock to come inside, and he led Mr. Brock into the bedroom where the victim was lying slumped against a closet door. Mr. Brock went outside and told Mr. Waller that something had happened to the victim, and Ms. Crutcher called 911.

Mr. Brock said that he was aware that Mr. Waller took drugs, but he did not think Mr. Waller had a serious drug problem. Mr. Brock said that he knew Defendant's name because Mr. Waller told him that Defendant was Mr. Waller's drug supplier. Mr. Brock said that he drove Mr. Waller to Defendant's house at some point before the shooting. Mr. Waller wanted to give Defendant some living room furniture as a partial payment of his outstanding drug debt. Mr. Brock helped Defendant load the furniture into Mr. Brock's truck. When they arrived at Defendant's apartment, Mr. Waller went inside. When Mr. Waller returned to the truck, he told Mr. Brock that they had to bring Defendant a recliner because Defendant was "not giving [him] nothing" for the furniture. The two men returned to Mr. Waller's house, loaded up the recliner, and returned to Defendant's apartment. Defendant was not home, so Mr. Waller left the recliner at the apartment building.

On cross-examination, Mr. Brock said that the front door was open when he, Mr. Hanna, and Mr. Waller returned to the Waller home. Mr. Brock estimated that about twenty minutes elapsed between the time Mr. Hanna discovered the victim's body and the 911 call.

Officer Chris Allison, with the Wilson County Sheriff's Department, arrived at the Waller residence at 8:32 p.m. Mr. Waller escorted Officer Allison to the body, and then Mr. Waller went back outside. Officer Allison did not notice a weapon at the crime scene. Detective Chris Hodge processed the crime scene. He found two unfired .357 bullet shells and one unfired 12-gauge shotgun shell in the victim's bedroom. Detective Hodge testified that there were no signs of forced entry, and the door leading to the basement was locked. A single strand of brownish-blond hair was found in the victim's hand. Detective Hodge said that the hair was not submitted for testing, but it resembled the victim's hair. Detective Hodge acknowledged that Mr. Waller's hair was dark brown.

Megan Bartlett was subpoenaed as a State's witness. Ms. Bartlett and Ashley Vaughan were staying with Angela Hurd, when Defendant arrived at Ms. Hurd's apartment around 9:30 a.m. on September 17, 2002. Defendant borrowed Ms. Vaughan's black, two-door Saturn, and said, "I'm going to kill a bitch if I don't get my $900." Ms. Bartlett said that Defendant returned Ms. Vaughan's car around noon that day. On cross-examination, Ms. Bartlett said that Defendant did not mention any names, and that she had never heard Defendant threaten anyone before. Ms. Bartlett said that Defendant did not talk about the shooting with her.

Leah Mendoza was also subpoenaed as a State's witness. She testified that she talked to Defendant on September 18, 2002, and he asked her to tell the police that he had been at her house on September 17, 2002. Ms. Mendoza refused his request. Ms. Mendoza had heard rumors about the shooting of the victim. When she asked Defendant why he did it, Ms. Mendoza said that Defendant replied, "You know me. Business." Ms. Mendoza testified on cross-examination that she had never seen Defendant act violently or threaten anyone before.

Antonio Hardy testified that Defendant came to his house early on September 17, 2002, and retrieved a gun. Mr. Hardy said that Defendant returned to his apartment later that afternoon and muttered under his breath that "he [had] shot somebody." Krissy Foster, Mr. Hardy's girlfriend, said that Defendant returned to the apartment around one o'clock p.m. with Mr. Hardy's brother, Phillip, and asked her to wash his hair for him. Ms. Foster said that Defendant also asked Antonio Hardy for some clothes, but Mr. Hardy's clothes did not fit Defendant. Ms. Foster, too, heard Defendant say that he had killed someone.

Jason Locke, a special agent with the T.B.I., testified that he and the investigating officers searched for Defendant after the shooting but were unable to locate him. Wilson County Sheriff Terry Ashe held a press conference at the Wilson County Justice Center at 1:00 p.m. on September 22, 2002, asking for information about Defendant's whereabouts. The press conference aired on the five o'clock evening news. Agent Locke said that he received a call from the Sheriff's Department at 6:00 p.m. that Defendant had voluntarily arrived at the department.

Agent Locke said that Defendant was read his *Miranda* rights and signed a written waiver at 7:20 p.m. Agent Locke said that Defendant "was extremely cooperative, good attitude, smiling, making jokes." Agent Locke said that Defendant initially said that he had gone to Gallatin on September 17, 2002 to see family members. Defendant said that he had lived with Mr. Waller and the victim for a period of time, and Defendant was aware that the victim was pregnant.

Agent Locke said that he orally interviewed Defendant from 7:20 p.m. until approximately 11:45 p.m., with several breaks during this time frame. At approximately 11:45 p.m., Defendant said, "Okay, I shot the bitch." They took a break, and then Defendant gave a written statement. Defendant said in his written statement that Mr. Waller and the victim had bought cocaine from him for several months preceding the shooting. Defendant said that he had a good relationship with Mr. Waller until Mr. Waller accused Defendant of breaking into his house. After using drugs all night, Defendant said that he decided to borrow Ms. Vaughan's car and drive over to Mr. Waller's house on September 17, 2002, to confront Mr. Waller about his accusations. Defendant said he carried a .38 revolver with him. The victim opened the door when he knocked. Defendant said that the victim told him she ought to shoot him and started walking down the hall to her bedroom. Defendant said that the victim "walked toward her closet and I shot her. I thought I had missed, so I shot a second time. I don't remember shooting any more than that."

Defendant said that he threw the revolver off the Burton Road bridge, and then burned the clothes he was wearing at the time of the incident in the Inman Court projects. Defendant said that he was "high on drugs" when he shot the victim, and that he had forgotten that the victim was pregnant.

Agent Locke said that Defendant completed his first written statement at 1:09 a.m. on September 23, 2002. Agent Locke said that Defendant was relaxed, calm, and cooperative during the process. Defendant accompanied Agent Locke to the Inman Court projects, but they could not find any burn marks on the ground where Defendant said that he had burned his clothes. Defendant and Agent Locke then went to the Burton Road bridge, arriving at about 1:55 a.m.

After they returned to the Sheriff's Department, Agent Locke said that Defendant gave a second written statement at 2:34 a.m. in which he identified a blue bandanna, a pair of blue jeans shorts, a pair of Reebok shoes, and a Cricket cell phone bill as his property. In his statement, Defendant acknowledged that he might have been wearing the shorts and Reebok shoes when he shot the victim, but that he could not remember. Defendant also said that he might not have burned the shorts as he had previously stated.

Agent Locke said that Defendant was read his *Miranda* rights again at 5:15 a.m. and he signed a written waiver. Defendant then gave a third written statement which concluded at 5:40 a.m. He stated that his girlfriend, Sherita Harrison, was with him when he shot the victim. Defendant said he was wearing the blue jean shorts and Reebok shoes when he shot the victim. He was also wearing a white tee shirt which Defendant later gave to Phillip Hardy for disposal. Defendant said he drove to his aunt's house in Lebanon after he shot the victim and borrowed some vice grips and a hammer.

Defendant said he put his revolver and his aunt's tools in his father's shed until the following Saturday. He then broke the gun into pieces with the hammer, and threw the pieces one by one on Bluebird Road.

Detective Ricky Knight accompanied Defendant to Bluebird Road on September 23, 2002, but they were unable to locate any parts of Defendant's gun. Detective Knight read Defendant his *Miranda* rights, Defendant signed a written waiver, and Defendant gave a fourth written statement at 9:20 a.m. In his statement, Defendant said that he threw the gun's cylinder on the left side of a creek near Bethany Lane, and threw the barrel on the right side of the creek. Defendant stated that he could not remember where he threw the other pieces of the gun.

Dr. Donald Wayne Nuessle, the deputy medical examiner for Wilson County, received a report of the victim's shooting at 8:30 p.m. on September 17, 2002. Dr. Nuessle testified that when he arrived at the residence, he found the victim slumped against a closet door with what appeared to be a bullet wound to her forehead. Based on the victim's skin and body temperature, and the degree of rigor mortis, Dr. Nuessle estimated that the victim had died at approximately 1:00 p.m. that day, with a variance of one and one-half to two hours either way. Dr. Nuessle was unable to confirm that the victim was pregnant at the time of his examination because of the degree of rigor mortis.

Shelly Betts, a forensic scientist with the T.B.I., testified that she examined several fragments of two bullets retrieved from the crime scene. Agent Betts said that the two bullets had the same class characteristics, but there were not enough individual markings on the fragments to tell whether or not the bullets were fired from the same weapon. Agent Betts said that the two bullets could have been fired from either a .38 special or a .357 magnum.

Dr. John Gerber performed the victim's autopsy on September 18, 2002. Dr. Gerber testified that the victim's toxicology screen was clear of drugs. Dr. Gerber stated that the victim died of two bullet wounds to the head. One bullet entered the left top of the victim's head, traveled downward and then backward and to the left. Bullet fragments were found in the temporal bulb at the base of the victim's brain. Dr. Gerber said that he could not detect the presence of stippling because of the victim's hair but there was soot present around the bone at the entry place of the bullet. The second bullet entered the victim's left forehead about three inches below the top of her head and traveled backward, down and to the right. The trajectory of both bullets was consistent with the weapon being fired from above the wound. Dr. Gerber said that stippling was present under the victim's eyes, the bridge of her nose, and her arm, indicating that the victim was holding her arm up when she was shot. Based on the stippling and soot around the victim's wounds, Dr. Gerber stated that the shooter was standing six inches to two feet away from the victim when he fired his weapon.

Dr. Gerber stated that the victim's female unborn child was twenty-three to twenty-four weeks old and showed normal internal and physical development. The fetus was viable and weighed 500 grams. The fetus' cause of death was asphyxiation from lack of oxygen in the victim's blood after the victim died of her gunshot wounds.

Mike Lamb, the victim's father, testified that the victim and Mr. Waller were experiencing financial difficulties even though the victim had recently inherited $250,000 from her grandmother. Mr. Lamb said that he lent the victim money to pay the arrearage on her mortgage payments because the bank was threatening foreclosure. Mr. Lamb said that one of the couple's cars had been repossessed. Mr. Lamp said that the victim and Mr. Waller had a prenuptial agreement.

The defense called Mr. Waller as a witness. Mr. Waller confirmed that he left home on September 17, 2002, between 5:00 a.m. and 5:15 a.m. with Mr. Brock. He said that he did not see Mr. Brock at work except at lunchtime. Mr. Waller said that he did not own a car at the time of the shooting because he had traded his car for drugs. Mr. Waller said that he owed money to a number of drug dealers, including Defendant and Phillip Hardy, but that he had never argued with Defendant over his outstanding debt to Defendant, and Defendant did not threaten him or ask for payment. Mr. Waller confirmed that he gave Defendant some furniture as partial payment of his debt. Mr. Waller said that the victim was going to receive an installment soon on her inheritance from her grandmother in the amount of $75,000, and Defendant gave Mr. Waller drugs on credit in anticipation of the inheritance. Mr. Waller said that nothing was taken from the house after the shooting.

In his written statement to the police, Mr. Waller said that he owed Defendant about $900.00 for the drugs he received from Defendant and Phillip Hardy between February or March 2002, and June 2002. Mr. Waller said that Defendant accused him of "snitching" on Defendant in February or March 2002. Defendant told Mr. Waller he would kill Mr. Waller's children if Defendant was arrested. Mr. Waller told Defendant that he was not a snitch, and he would kill Defendant if he harmed his children. Mr. Waller said that those were the only threats Defendant ever made against him.

Mr. Waller said that on September 3, 2002, he and the victim heard noises in the basement. When they investigated, they found Defendant in the basement and Phillip Hardy hanging from a window. Defendant and Mr. Hardy accompanied Mr. Waller and the victim upstairs, and Defendant asked Mr. Waller about the debt. Mr. Waller said that the victim told Defendant she was going to find out soon how much money she was receiving from her grandmother's estate, and Defendant said to just call him when the money came in. Mr. Waller said that the incident was "no big deal."

Mr. Waller denied that he kept guns in the house but admitted that several gun cartridges were found on top of his bedroom dresser after the shooting. Mr. Waller said that the gun cartridges belonged to a friend. Mr. Waller said that he and the victim had discussed buying a gun for the house but had not done so at the time of the shooting. Mr. Waller said that he had seen Defendant carrying guns before.

On redirect examination, Mr. Waller said that he had given his car to Defendant in exchange for drugs. Mr. Waller said that Defendant did not keep up the car payments, and the car was eventually repossessed by the bank.

Thomas Carey, the victim's next door neighbor, testified that the Wallers were good neighbors until the summer of 2002. Mr. Carey said that people started arriving at the Wallers' residence at all hours of the night. Mr. Carey said that he and a neighbor across the street had items stolen from their property that summer. Mr. Carey stated that he heard someone shoot a gun off the Wallers' back deck approximately three weeks before the incident, and he called the police.

Deborah Carey testified that she drove by the victim's house some time before noon on September 17, 2002. She saw a small, white car parked in the driveway, but she did not see the victim.

The State called Adrian Dodd and Robert Britten as rebuttal witnesses. Mr. Dodd testified that he worked for Townsend Tree Service, and was working with Mr. Waller in Williamson County on September 17, 2002. Mr. Dodd said that Mr. Waller was with him all day. They drove their truck to the dump around 2:00 p.m. The truck had transmission trouble, and Mr. Dodd returned to the job site around 2:45 p.m. after he called a mechanic. Mr. Dodd said that Mr. Waller arrived at the parking lot between 5:00 p.m. and 5:30 p.m. On cross-examination, Mr. Dodd said that he saw Mr. Brock at work on September 17, 2002, but not Mr. Hanna.

Mr. Brittern, also an employee at Townsend Tree Service, testified that Mr. Waller's truck broke down around 3:00 p.m. or 3:30 p.m. on September 17, 2002. Mr. Brittern said that Mr. Waller waited at the dump while Mr. Brittern worked on the truck for thirty or thirty-five minutes, and then Mr. Waller followed Mr. Brittern back to the parking lot. Mr. Brittern also stated that he saw Mr. Brock and Mr. Hanna at work that day.

## II. Motion to Suppress Statements

At the hearing on Defendant's motion to suppress his statements to the police, Agent Locke testified that Defendant voluntarily came to the Wilson County Sheriff's Department in response to a televised press conference conducted by Sheriff Ashe on September 22, 2002. Agent Locke said that Defendant arrived at the Sheriff's Department around 6:00 p.m., and he arrived at approximately 7:00 p.m. Agent Locke read Defendant's *Miranda* rights to him, and Defendant signed a written waiver at 7:20 p.m. Agent Locke said that Defendant did not appear to be under the influence of any drugs, and appeared to understand the process, including the waiver of his *Miranda* rights.

On cross-examination, Agent Locke said that he offered to either videotape the taking of Defendant's statements, or take his statements on the computer, and Defendant chose the computer. Agent Locke said that Defendant never requested the assistance of counsel. Agent Locke outlined the various breaks and interviews that occurred during the thirteen-hour interview process. At 7:20 p.m., Agent Locke began the initial interview. Defendant was given the opportunity to use the restroom and smoke a cigarette at 8:15 p.m. Agent Locke also gave Defendant a cup of coffee. The interview continued from 8:30 p.m. until 9:05 p.m. when Defendant took another break and was provided a soft drink. Agent Locke interviewed Defendant from 9:17 p.m. until 10:45 p.m. when Defendant took a restroom break. Agent Locke then interviewed Defendant from 10:48 p.m. until

11:45 p.m. when Defendant made his first incriminating statements. They took a five-minute break, and then prepared Defendant's first written statement until Defendant took a break at 12:45 a.m. The break lasted about ten minutes, and Defendant's first written statement was concluded at 1:09 a.m.

Defendant agreed to accompany the officers to the Inman Court projects, and they arrived at that destination at 1:30 a.m. The officers and Defendant then traveled to Burton Road at Defendant's direction, arriving at approximately 1:55 a.m. The officers discussed certain discrepancies in Defendant's statement as they drove back to the justice center. Defendant gave a second written statement identifying some clothes found by the sheriff's department as the clothes he wore when he shot the victim. The second written statement was concluded at 2:34 a.m.

Agent Locke said that between 2:34 a.m. and 5:05 a.m., he and other officers interviewed Ms. Harrison and obtained her written statement at approximately 3:59 a.m. Agent Locke said that he went to talk to Defendant during a break in Ms. Harrison's interview, and Defendant was asleep. Agent Locke read Defendant his *Miranda* rights again at 5:15 a.m., and Defendant signed a third written statement at 5:40 a.m.

Agent Locke testified that he followed normal procedures in preparing Defendant's written statements. Agent Locke read each statement out loud to Defendant as he typed, giving Defendant the opportunity to make any changes. Agent Locke printed out the statement once it was completed and read it to Defendant a second time. Any changes were made, and Defendant read the statement again before he signed it. Agent Locke denied that he had promised Defendant a reduced charge in exchange for his statement.

Detective Knight testified that he read Defendant his *Miranda* rights at 9:20 a.m. on September 23, 2002, and Defendant signed a written waiver. Defendant appeared to understand the process and did not ask any questions about his statement or the waiver of his *Miranda* rights. Detective Knight, Defendant, and Detective Chris Hodge drove to the Bluebird Road area at 9:25 a.m., arriving at the bridge on Bethany Road at 10:25 a.m. They returned to the police station at 10:30 a.m.

At the conclusion of the hearing, the trial court found that Defendant's statements were "lawfully obtained" and denied his motion to suppress. In his appeal, Defendant argues that the totality of the circumstances under which his statements were made do not support the trial court's finding that his statements were freely and voluntarily given. Defendant contends that there was no evidence that Defendant could read or write, or that he understood the consequences of waiving his right against self-incrimination. Leah Mendoza, Detective Knight's sister, stated at trial that she only testified because she was scared that she would go to jail if she did not do so. Antonio Hardy testified at trial that "they" said they would put him in jail and take away his son if he lied. Defendant argues that based on the pattern of threats used by police officers against the State's witnesses, it is reasonable to conclude that Defendant, too, was threatened during his thirteen-hour interview.

When reviewing the trial court's decision on a motion to suppress, this Court conducts a *de novo* review of the trial court's conclusions of law and application of law to facts. *See State v. Walton*, 41, S.W.3d 75, 81 (Tenn. 2001). However, the trial court's ruling is binding unless the evidence contained in the record preponderates against it. *See State v. Daniel,* 12 S.W.3d 420, 423 (Tenn. 2000).

Both the United States and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself or herself. *See* U.S. Const. Amend. V; Tenn. Const. art. 1, § 9. "[I]n order for a confession to be admissible, it must be 'free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . .'" *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 187, 42 L. Ed. 2d 568 (1897)). The totality of the circumstances surrounding the giving of the statement must be examined. *See State v. Bush*, 942 S.W.2d 489, 500 (Tenn. 1997). "A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. Rather coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Smith*, 933 S.W.2d at 455 (citations omitted).

The test for voluntariness under the Tennessee constitution "'is broader and more protective of individual rights than the test of voluntariness under the fifth amendment.'" *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001) (quoting *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992)). "For the relinquishment of rights to be effective, the defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights." *State v. Thacker*, 164 S.W.3d 208, 249 (Tenn. 2005) (appendix) (citing *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994)). A defendant's level of reading and writing skills is just one factor to be considered in looking at the totality of the circumstances surrounding the making of a defendant's statement. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000).

There is no proof in the record that Defendant was illiterate. In fact, the presentence report indicates that Defendant was twenty years old at the time of the incident and had completed the eighth grade. Agent Locke and Detective Knight testified that Defendant appeared to understand his *Miranda* rights and the interview process, and Defendant executed three separate written waivers of his *Miranda* rights. Moreover, Agent Locke testified that as part of the interview process, he read Defendant's *Miranda* rights and statements out loud before giving Defendant the opportunity to read the statements and waiver forms to himself. Defendant was given numerous comfort and refreshment breaks during the interview process, and he voluntarily accompanied the police officers on two trips outside the justice center. Defendant does not point to any specific examples of what he perceives to be coercion on the part of the interviewing officers.

Based upon our review and the totality of the circumstances surrounding Defendant's interrogation, we conclude that the evidence does not preponderate against the trial court's finding that Defendant voluntarily and knowingly waived his right against self-incrimination and voluntarily

gave his statements concerning the killing of the victims. Accordingly, the trial court did not err in denying Defendant's motion to suppress his statements.

### III. Post-Mortem Photograph of Fetus

Defendant argues that the trial court erred in admitting into evidence a postmortem photograph of the victim's unborn child. Defendant contends that the photograph was not relevant because Dr. Gerber's testimony adequately described the weight and development of the victim's fetus. Alternatively, even if relevant, Defendant argues that the probative value of the photograph was substantially outweighed by the danger of unfair prejudice.

Prior to the introduction of the photograph in question, the trial court conducted a hearing outside the presence of the jury to consider the testimony of Dr. Gerber, who performed the victim's autopsy and that of her fetus. Dr. Gerber selected eight postmortem photographs of the victim and three photographs of the fetus which would assist the jury in understanding his testimony. The trial court found that "[i]t's the doctor's testimony that [the photographs] would be helpful in explaining what he did to the jury, and it would be an aid to the jury to know what he knows. So the Court is going to allow those."

Ultimately, only one postmortem photograph of the victim's fetus was admitted into evidence. "Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004) (citing *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997)). A policy of liberality is followed in Tennessee in the admission of photographs into evidence. *See State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Photographs of a victim in a murder case are admissible if they are relevant to a material issue at trial "notwithstanding their gruesome and horrifying character." *Id*. at 951 (citations omitted).

The trial court must first determine whether the proffered photograph is relevant. Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Tenn. R. Evid. 401.

In the instant case, Defendant was charged in count two of the indictment with the premeditated killing of "baby Waller, a viable fetus at the time of the killing" under Tennessee Code Annotated section 39-13-202(a)(1). Under this statutory section, the offense of first degree murder includes a "premeditated and intentional killing of another." *Id*. For the purpose of the murder offenses, the words "'another' and 'another person' include a viable fetus of any human being when any such term refers to the victim of any act made criminal by the provisions of this part." *Id*. § 39-13-214(a). The State was thus required to prove that the victim's fetus was viable in order to support a murder conviction in the case *sub judice*. Although Dr. Gerber testified that the fetus weighed 500 grams and showed normal internal and physical development, the photograph of the fetus assisted the jury in understanding the medical examiner's testimony in determining whether the fetus was in

fact viable.  *See State v. Williamson*, 919 S.W.2d 69, 78-79 (Tenn. Crim. App. 1995) (Autopsy photograph of murder victim's stillborn child who was surgically removed postmortem in an attempt to save the baby's life was relevant to the issue of viability).

The trial court by its findings also implicitly found that the probative value of the photograph exceeded the danger of prejudice.  In the instant case, we conclude that the photograph, although naturally disturbing, is not particularly gruesome, and the probative value of the photograph is not substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403; *Williamson*, 919 S.W.2d at 79.  The trial court did not err in ruling the evidence admissible.  Defendant is not entitled to relief on this issue.

## IV.  Sufficiency of the Evidence

Defendant's challenge to the sufficiency of the convicting evidence essentially calls into question the credibility of the State's witnesses, issues more properly reserved for the jury's resolution. Specifically, Defendant contends that there is no physical evidence connecting Defendant to the crime, and the evidence was insufficient to support the State's theory that the victim was shot over a drug debt between Defendant and Mr. Waller.  Defendant points out that nothing was stolen from the residence after the victim was shot, and Mr. Waller testified that Defendant was not concerned about Mr. Waller's outstanding debt.  Mr. Waller's neighbor also testified that she saw a small, white car parked at the Waller residence some time before noon on September 17, 2002, and the evidence showed that Defendant was driving a black car that day.

In reviewing Defendant's challenge to the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979).  Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt.  *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991).  The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State.  *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Defendant was convicted in count one of the premeditated murder of Christy Waller.  As relevant here, first degree murder is defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1).  A premeditated act is one "done after the exercise of reflection and judgment."  *Id*. § 39-13-202(d).  A finding of "premeditation" requires that:

the intent to kill must [be] formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.*

Motive is not an essential element of first degree premeditated murder. *See id*. § 39-13-202(a)(1). Although the State was thus not required to prove Defendant's motive in killing the victim, motive may help prove premeditation or intent. In the case *sub judice*, Mr. Brock testified that he was aware that Mr. Waller had a drug problem, and that he had accompanied Mr. Waller before the shooting when Mr. Waller delivered some furniture to Defendant in partial payment of his outstanding drug debt to Defendant. Mr. Waller said that he owed Defendant $900.00 at the time of the victim's shooting, and that Defendant had fronted Mr. Waller drugs for some months prior to the shooting in anticipation of the victim's receipt of an inheritance. Ms. Bartlett testified that Defendant arrived at Ms. Hurd's house on September 17, 2002 to borrow Ms. Vaughan's car and said that Defendant stated he was "going to kill a bitch if [he did not] get [his] $900.00." Ms. Mendoza testified that she asked Defendant why he shot the victim, and Defendant responded, "Business." While Mr. Waller testified that Defendant did not threaten him because of the outstanding debt, any conflicts in the testimony were resolved by the jury.

Mr. Waller testified that Defendant had broken into his home shortly before the incident. Mr. Waller also described a previous altercation with Defendant when Defendant accused Mr. Waller of "snitching" on him and threatened to harm Mr. Waller's children. In his written statement to the police, Defendant said that he had a problem with Mr. Waller because Mr. Waller accused Defendant of breaking into his house and described his encounter with the victim as follows:

I asked [the] victim about the shit [Mr. Waller] was talking about, and [the victim] started talking about me breaking in the house. This was on the way walking back to her bedroom. [Ms. Harrison] stayed in the living room. When [the victim] and I were in her bedroom, I shot her twice. I thought I missed the first time, and I shot her again.

Dr. Gerber testified that the victim died as a result of two gunshot wounds to her forehead and the top of her head. Dr. Gerber stated that the bullets' trajectory was consistent with the shooter standing above the victim when he fired his weapon, and there was stippling on the victim's arm consistent with the victim holding her arm up as a defensive gesture. Mr. Hardy testified that Defendant came over to his apartment early on September 17, 2002 and retrieved a gun. Defendant stated in his written statement that he hid his gun in his father's shed until Saturday, September 22, 2002, when he broke the gun into pieces and threw the pieces separately out his car window.

Whether Defendant was motivated more by Mr. Waller's failure to pay his outstanding drug debt or Mr. Waller's accusations of burglary, "[t]he element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing." *State v. Thompson*, 43 S.W.3d 516, 522 (Tenn. Crim. App. 2000) (citing *Bland*, 958 S.W.2d at 660). In *Bland*, our Supreme Court listed several circumstances which may demonstrate the presence of premeditation, including "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citations omitted).

Based on our review of the record, we conclude that the evidence was sufficient to establish premeditation and intent in the killing of Christy Waller. The fact that some of the State's witnesses expressed reluctance in appearing at trial goes to the credibility of their testimony. We conclude that a reasonable jury could conclude beyond a reasonable doubt that Defendant was guilty of first degree premeditated murder.

Although Defendant does not specifically challenge his second degree murder conviction, we conclude that a reasonable jury could conclude that Defendant was guilty of this offense beyond a reasonable doubt. Second degree murder is defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). The term "another" includes a viable fetus. The "knowing" *mens rea* for second degree murder requires proof that the defendant is "aware that his or her conduct is reasonably certain to cause death." *State v. Page*, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002); *see also* Tenn. Code Ann. §§ 39-11-106(a)(20), -302(b).

Dr. Gerber testified that the victim was approximately six months pregnant, and, based on the photographs admitted at trial, the victim's pregnancy was clearly visible. Defendant stated in his written statement to the police that he had stayed overnight at the Waller residence before the shooting, and Mr. Waller testified that Defendant had been to his house several times and interacted with the victim. Agent Locke testified that Defendant knew the victim was pregnant. Defendant admitted in his written statement that he knew the victim was pregnant but, when he shot her, he "had forgotten" about the pregnancy. Defendant shot the victim once at close range, and then shot her a second time because he though he had missed the first time.

Dr. Gerber testified that the fetus weighed 500 grams and had developed normally both internally and externally. Dr. Gerber stated that although the fetus might have required some artificial assistance if born at this stage of development, the fetus was capable of sustaining life outside the wound. Dr. Gerber testified that the fetus died as a result of lack of oxygen in the blood when the victim died.

Based on the foregoing, we conclude that the evidence was sufficient to support Defendant's conviction of the second degree murder of the victim's fetus.

**V. Sentencing Issues**

Defendant argues that the trial court erred in not considering certain mitigation factors and in misapplying enhancement factors when determining the length of his sentence for his second degree murder conviction. Defendant also contends that the trial court erred in ordering his sentence for second degree murder to be served consecutively to his life sentence.

When a defendant challenges the length, range, or manner of service of a sentence, this Court conducts a *de novo* review with a presumption that the determinations made by the trial court are correct. *Id.* § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001) (citations omitted). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). Because the trial court erred in certain of its sentencing determinations, our review is *de novo* without a presumption of correctness. Tenn. Code Ann. § 40-35-401(d); *Ashby*, 823 S.W.2d at 169.

The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. In conducting a *de novo* review of a sentence, we must consider: (1) the evidence, if any, received at the trial and sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; *State v. Smith*, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

As a Range I standard offender, Defendant is subject to a sentence of between fifteen and twenty-five years for his second degree murder conviction, a Class A felony. Tenn. Code Ann. §§ 40-35-112(a)(1). In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint of the range if there are no enhancement or mitigating factors. *Id.* § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence at or above the presumptive sentence for the Class A felony conviction, but still within the range. *Id.* § 40-35-201(d).

At the sentencing hearing, Betsy Jakalski, the preparer of the presentence report, testified that Defendant was born on July 6, 1982 and had completed the eighth grade in school. Ms. Jakalski stated that Defendant had not taken any steps toward obtaining his GED since leaving school.

Ms. Jakalski stated that Defendant had two misdemeanor convictions for joyriding and evading arrest. The pre-sentence report, page nine, indicates that Defendant was sent to juvenile hall

and on to boot camp because of truancy. Ms. Jakalski stated that a warrant of probation violation for his misdemeanor convictions was filed on April 1, 2002, for failure to report to his probation officer, failure to pay costs and fees, and failure to maintain employment. After a hearing, Defendant was again placed on probation on June 10, 2002, with the probation period extended six months. Defendant was on probation when the current offenses were committed.

Ms. Jakalski said that Defendant stated that he had never "had any type of legitimate employment." Defendant told Ms. Jakalski that he earned money by selling drugs, and that he made anywhere between $5,000 each week and $5,000 each day. Defendant, however, said that he did not own anything of value. Ms. Jakalski stated that Defendant began selling drugs when he was eleven years old.

Ms. Jakalski said that Mr. Lamb, the victim's father, had provided a victim impact statement describing the effect his daughter's death had on the family. Ms. Jakalski said that according to Mr. Lamb, his life was "in shambles." Mr. Lamb attributed his wife's recent death from a heart condition to her stress and worry over the victim's death.

Defendant stated in the pre-sentence report that he first began using marijuana when he was eleven years old and alcohol when he was twelve years old. Defendant said he began using cocaine, Lortab, Xanex and ecstasy when he was thirteen years old. Defendant said that he stopped using alcohol when he was eighteen years old because he preferred drugs.

On cross-examination, Ms. Jakalski said that Defendant was pleasant during the interview and answered all of her questions. Defendant told Ms. Jakalski that he had found God while he was incarcerated prior to trial and held Bible study sessions in jail.

At the conclusion of the sentencing hearing, the trial court did not find the presence of any mitigating factors. The trial court applied enhancement factor (2), Defendant has a prior history of criminal convictions and behavior; enhancement factor (4), the offense involved more than one victim; enhancement factor (5), the victim (fetus) was particularly vulnerable; enhancement factor (9), Defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community; and enhancement factor (10), Defendant employed a firearm during the commission of the offense. Tenn. Code Ann. § 40-35-114(2), (4), (5), (9) and (10). Based on the presence of these enhancement factors and no mitigating factors, the trial court sentenced Defendant to twenty-five years' confinement.

In determining the manner of services of Defendant's sentences, the trial court found:

Now, consecutive or concurrent. Well, the proof probably isn't that he's a professional criminal although he's devoted himself to a lot of activities during his life. But as far as conviction[s], he's been charged with, those records are not what you would call extensive of a professional criminal. Activity is extensive. Criminal activity is extensive although it's minor stuff that he's had in the past. The defendant

is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. I think that applies to him. He committed this offense while on probation, that's another factor. And considering all of these, the case as a whole, . . . the Court believes [the sentence] ought to be run consecutive to the conviction for first degree murder.

## A. Mitigating Factors

Defendant argues that the trial court erred in not mitigating his sentence based on his youth at the time of the offenses and because Defendant assisted the police officers in their investigation. *See* Tenn. Code Ann. § 40-35-113(6), (10). The State argues that Defendant has waived this issue for purposes of appeal because he failed to file a written notice of mitigating factors prior to sentencing, failed to present any evidence supporting the application of these mitigating factors at the sentencing hearing, and failed to object to the trial court's finding that no mitigating factors were present.

Nonetheless, we note that the trial court specifically considered all of the circumstances of the case in determining the length of Defendant's sentence, including presumably Defendant's excursions with the police officer to recover property used in the commission of the crime. Defendant's age at the time of the commission of the offense was established at the sentencing hearing through Ms. Jakalski's testimony and the presentence report. A panel of this Court recently concluded that an issue based on the failure of the trial court to consider certain mitigating factors is not waived for purposes of appeal if there is evidence of such factors in the record. *State v. Lyle T. Van Ulzen and Billy J. Coffelt*, No. M2004-02462-CCA-R3-CD, 2005 WL 2874654, at *3 (Tenn. Crim. App., at Nashville, Oct 31, 2005), *no perm. to appeal filed*. The court noted:

> The Sentencing Commission's Comments are clear that the trial court is required to take into account all of the evidence presented at the trial and the sentencing hearing. Therefore, if evidence of a mitigating factor or factors is present at the trial or the sentencing hearing, the trial court is required to consider them in the sentencing process.

*Id*. at *4.

In the case *sub judice*, the trial court stated that it considered all of the facts and circumstances of the offenses. Although the trial court did not specifically address the mitigating factors alluded to by Defendant at the sentencing hearing, the trial court found that no mitigating factors were applicable, indicating that the trial court had, in fact, considered the statutory mitigating factors. Thus, we will consider Defendant's issue on the merits.

A trial court may consider as a mitigation factor the fact that "[t]he defendant assisted the authorities in locating or recovering any property or person involved in the crime." Tenn. Code Ann.

§ 40-35-113(10). Factors to consider in determining whether this mitigating factor is appropriate include the defendant's truthfulness, and the significance and usefulness of the defendant's assistance. *State v. Chris Haire*, No. E2000-01636-CCA-R3-CD, 2002 WL 83604, *21 (Tenn. Crim. App., at Knoxville, Jan. 22, 2002), *perm. app. denied* (Tenn. June 24, 2002) (citations omitted).

Agent Locke testified that Defendant accompanied the police officers first to the Inman Court housing projects where Defendant said he had burned the clothes he was wearing when he committed the offenses, and then to Burton Road where Defendant said he had disposed of the murder weapon. Defendant later recanted these statements, and no property was discovered as a result of this venture.

The second example of assisting the police occurred when Defendant accompanied Detective Knight to Bluebird Road where Defendant said he had discarded the broken pieces of his gun. Again, no property relating to the crime was recovered.

Although Agent Locke and Detective Knight confirmed Defendant's willingness to accompany them on these excursions, Defendant's cooperation was neither useful nor significant, and the first trip at least was based on inaccurate information. The trial court did not err in not applying this mitigating factor.

Defendant was twenty years old when the offense was committed. Defendant argues that because of his youth, he lacked substantial judgment in committing the offense, and that this factor should be considered in mitigation of his sentence. *See* Tenn. Code Ann. § 40-35-113(6). Our Supreme Court has stated that when considering application of this factor, the court should consider "the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct." *State v. Adams*, 864 S.W.2d 31, 33 (Tenn. 1993); *State v. Adams*, 45 S.W.3d 46, 60-61 (Tenn. Crim. App. 2000). By Defendant's own account, he was an experienced drug dealer, generating significant funds from his criminal activities. There is nothing in the record to suggest that Defendant lacked substantial judgment because of his youth. The trial court did not err in refusing to consider Defendant's youth as a mitigating factor in determining the length of his sentence for his second degree murder conviction.

## B. Enhancement Factors

Defendant does not challenge the trial court's application of enhancement factor (10) based on his use of a firearm during the commission of the offense. Defendant argues, however, that the trial court erred in applying enhancement factor (2) because his prior criminal history consists of only two "misdemeanor convictions."

The trial court found that Defendant had both a "previous history of crime, conduct, convictions and whatever, or conduct." Criminal behavior not resulting in a criminal conviction may be considered under enhancement factor (2). *See State v.* Carico, 968 S.W.2d 280, 288 (Tenn. 1998);

see *also State v. Alexander*, 957 S.W.2d 1, 7 (Tenn. Crim. App. 1997) (The defendant's cocaine habit at the time the offenses were committed justified application of enhancement factor (2)); *State v. Ladella Renee Hill*, No. M2003-00127-CCA-R3-CD, 2004 WL 63483, *7 (Tenn. Crim. App., at Nashville, Jan. 14, 2004), *perm. app. den.* (Tenn. June 1, 2004) (The defendant's admitted history of drug use as a juvenile may be relied upon to support a finding that the defendant has a history of criminal behavior).

Defendant admitted in his written statement to the police that he had sold cocaine to Mr. Waller and the victim for several months preceding the shooting. Defendant stated in the pre-sentence report that he made his living selling drugs, and that he earned a considerable amount of money from such illegal activity. Moreover, Defendant acknowledged that he used cocaine on the night before the offense. Based on the foregoing, the evidence does not preponderate against the trial court's finding that enhancement factor (2) was appropriate based on Defendant's extensive criminal activity conducted prior to the commission of the offenses.

Defendant argues that the trial court erred in enhancing his sentence based on the fact that the victim was an unborn child because the statute does not delineate this circumstance as an enhancement factor. We believe that Defendant misconstrues the manner in which the trial court considered the fact that the victim of his second degree murder conviction was a fetus. The State filed a notice of intent to seek enhanced punishment based, in part, on the fact that "the [fetus] victim of the offense was particularly vulnerable because of age or physical or mental disability." Tenn. Code Ann. § 40-35-114(5). In its findings, the trial court concluded, "[a]nd the child that was killed was not even born yet, a viable fetus, according to the jury's finding and my finding." Based upon our review of the transcript of the sentencing hearing as a whole, we conclude that the trial court, albeit not specifically referencing enhancement factor (5), did consider the fetus victim's vulnerability in determining the length of Defendant's sentence for his second degree murder conviction.

Enhancement factor (5) requires a finding that the victim was particularly vulnerable to the offense because, as relevant here, of the victim's age. *See* Tenn. Code Ann. § 40-35-114(5). "A victim's youth does not necessarily equate with vulnerability, however." *State v. Lewis*, 44 S.W.3d 501, 505 (Tenn. 2001) (citing *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997)). The *Lewis* court stated,

> The State is required to proffer evidence in addition to the victim's age to establish particular vulnerability; however, that evidence "need not be extensive." *Poole*, 945 S.W.2d at 97. Also, a court may consider the natural vulnerabilities attendant to the extreme ends of the aging spectrum by giving "additional weight . . . to the age of the victim in those cases where a victim is extremely young or old." *Id.*

*Lewis*, 44 S.W.3d at 505.

A victim's vulnerability may be a factor if that vulnerability renders the victim incapable of "resisting, summoning help, or testifying against the perpetrator." *See Poole*, 945 S.W.2d at 96 (quoting *Adams*, 864 S.W.2d at 35). Enhancement factor (5) has been previously applied in cases where the victim is a young child or infant and thus entirely dependant on an adult for protection. *See State v. Collins*, 986 S.W.2d 13, 23 (Applying enhancement factor (5) where victim of the second degree murder offense was a newborn child). The evidence does not preponderate against the trial court's finding that consideration of enhancement factor (5) in determining the length of Defendant's sentence for the second degree murder of the fetus victim was appropriate.

Although he does not cite any authority in support of his contention, Defendant argues that the trial court improperly enhanced his sentence based on a prior violation of probation because the violation was not "willful." A defendant's sentence may be enhanced if he or she has demonstrated a previous "unwillingness to comply with the conditions of a sentence involving release into the community." Tenn. Code Ann. § 40-35-114(9). The statutory enhancement factor does not make a distinction between "technical" violations of probation and offense-based violations. The evidence does not preponderate against the trial court's finding that enhancement factor (9) was applicable.

Defendant argues that the trial court misapplied enhancement factor (4), that the offense involved more than one victim. *See* Tenn. Code Ann. § 40-35-114(4). We agree. Although there were clearly two victims in this case, Defendant was charged with and separately convicted for the death of both victims. Thus, the trial court erred in applying enhancement factor (4). *See State v. McKnight*, 900 S.W.2d 36, 54 (Tenn. Crim. App. 1994) (Although the defendant's criminal conduct involved at times more than one victim, the defendant was convicted separately for each victim, and application of enhancement factor (4) was thus inappropriate).

Although the trial court erred in considering one of the enhancement factors in its sentencing determinations, based upon our review, application of enhancement factors (2), (5) (9), and (10) was appropriate. Based on the presence of four enhancement factors and no mitigating factors, the trial court did not err in sentencing Defendant to twenty-five years for his second degree murder conviction. Defendant is not entitled to relief on this issue. *See State v. Gomez*, 163 S.W.3d 632, 659 (Tenn. 2005) ("[E]ven after an enhancement factor is found, this statute affords the trial court the discretion to choose an appropriate sentence anywhere within the statutory range.")

## C. Consecutive Sentencing

As noted above, the trial court imposed consecutive sentences based upon Defendant being a dangerous offender and upon the fact that Defendant was on probation at the time the offenses were committed. *See* Tenn. Code Ann. §§ 40-35-115(b)(4) and (b)(6). The trial court ruled that the facts did not justify imposition of consecutive sentencing based upon Defendant being a "professional criminal" as contemplated in Tennessee Code Annotated section 40-35-115(b)(1).

Defendant challenges the trial court's finding that he is a dangerous offender. He argues that the trial court failed to articulate the specific findings set forth in *State v. Wilkerson*, 905 S.W.2d

933, 939 (Tenn. 1995) and thus may not rely upon this factor in determining whether or not Defendant should serve his sentences consecutively.

When a Defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to run consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. In this instance, the trial court found as one of the factors that Defendant was "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. §40-35-115(a)(4). If the trial court rests its determination of consecutive sentencing on this category, the court must make two additional findings. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). First, the trial court must find that an extended sentence is necessary to protect the public from further criminal conduct by Defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses. *Wilkerson*, 905 S.W.2d at 939.

Although such specific factual findings are unnecessary for the other categories enumerated in Tennessee Code Annotated section 40-35-115(b), the imposition of consecutive sentences is also guided by the general sentencing principles that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *Imfeld*, 70 S.W.3d at 708 (quoting Tenn. Code Ann. §§ 40-35-102(1) and -103(2)); *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In the instant case, the trial court failed to make the specific factual findings required by *Wilkerson* as a prerequisite to finding that Defendant is a dangerous offender for whom consecutive sentencing is appropriate. Accordingly, we must determine if consecutive sentencing was appropriate based on another statutorily enumerated criteria.

The trial court also found that consecutive sentencing was appropriate because Defendant was on probation when he committed the current offenses. *See* Tenn. Code Ann. § 40-35-115(b)(6); *see State v. Vidal L. Strickland*, No. M2002-01714-CCA-R30-CD, 2003 WL 22243440, *15 (Tenn. Crim. App., at Nashville, Sept. 30, 2003) (Commission of current offense while on probation for a misdemeanor offense sufficient to support trial court's order of consecutive sentences). It is necessary to find the presence of only one of the statutory categories listed in Tennessee Code Annotated section 40-35-115(b) to support the imposition of consecutive sentences. *State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997).

Even though we conclude that consecutive sentencing was justified by Defendant being on probation at the time of the offense, we are constrained to address the trial court's legal conclusion that Defendant did not qualify as a "professional criminal." A professional criminal is one who has knowingly devoted his or her "life to criminal acts as a major source of livelihood." *Id*. The trial court found that Defendant had engaged in extensive criminal activity, including the sale of drugs, but appeared to consider only Defendant's prior misdemeanor record in determining whether or not Defendant was a professional criminal.

The statute does not require the State to show, however, that a defendant's prior convictions directly relate to or arise out of the criminal activity from which the defendant derives substantial income. Nor is it necessary that the offenses for which a defendant is being sentenced arise out of the same type of criminal activity which supports his or her status as a professional criminal. The statute requires proof that Defendant has knowingly devoted his life to criminal activity as a major source of livelihood. Tenn. Code Ann. § 40-35-115(b)(1); *see also State v. Mickens,* 123 S.W.3d 355, 396 (Tenn. 2003) (The defendant, who admitted that he had never had any gainful employment and was a governor for the South Memphis Gangster Disciples was properly considered a professional criminal for whom consecutive sentencing was appropriate); *State v. Desirey*, 909 S.W.2d 20, 32 (Tenn. Crim. App. 1995) (Evidence that the defendant was substantially involved in illegal gambling and derived substantial income from that activity supported a finding that the defendant was a professional criminal subject to consecutive sentencing).

Defendant admitted that he sold drugs to support himself prior to his incarceration and has done so since a very early age. He acknowledged that he has never been gainfully employed, but stated that he earned between five thousand dollars a week to five thousand dollars a day from his illegal drug dealing. Although he denied owning any assets of value, Defendant admitted that he sometimes spent as much as one thousand dollars a day to support his drug habit. Defendant further stated in the pre-sentence report that, at age nineteen, he "had everything he ever needed and wanted, including six cars, but squandered all of his drug money on 'hotel suites and partying.'" Defendant acknowledged that he had used drugs since he was eleven years old. He said that he smoked between "an ounce to one pound" of marijuana each day until he was incarcerated, and, in addition to other drugs, he used between four and fourteen grams of cocaine every weekend until his arrest.

Various panels of this Court have previously found that a defendant whose sole source of income was derived from the ongoing sale of drugs was a professional criminal as contemplated in Tennessee Code Annotated section 40-35-115(b)(1). *See State v. Harold Halloway, Jr.*, No. E2004-00882-CCA-R3-CD, 2005 WL 1981791, *16 (Tenn. Crim. App., at Knoxville, Aug. 16, 2005), *no perm. to app. filed* (Record amply supports a finding that the defendant was a professional criminal with no source of income other than that derived from the sale of drugs); *State v. Charles M. Thomas*, No. M2000-02576-CCA-R3-CD, 2002 WL 122930, *3 (Tenn. Crim. App., at Nashville, Jan. 23, 2002), *perm. app. den.* (Tenn. July 15, 2002) (The defendant's sparse work history coupled with his admission that he had sold drugs since he dropped out of high school was sufficient to support the trial court's finding that the defendant was a professional criminal); *State v. James Andrew Nichols*, No. M2000-02758-CCA-R3-CD, 2002 WL 31249917, *5 (Tenn. Crim. App, Oct. 7, 2002), *perm. app. den.* (Tenn. Feb. 18, 2003) (The defendant, who admitted a lengthy history of drug abuse dating to his childhood and that he supported his drug habit by working in the "meth industry" and selling "meth" supported a finding that Defendant was a professional criminal).

Based on the foregoing, we conclude in our *de novo* review that the uncontroverted facts in the record support a conclusion that Defendant is a professional criminal for whom consecutive sentencing is appropriate.

We conclude that an aggregate sentence of life imprisonment plus twenty-five years is justly deserved in relation to the seriousness of the offense, and not greater than that deserved.  *See* Tenn. Code Ann. § 40-35-102(1) and -103(2).  Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgements of the trial court.

_____
THOMAS T. WOODALL, JUDGE